**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| BRETT C. CONOVER,           ) | |
|            ) | |
|     Plaintiff,         ) | |
|            ) | |
|     vs.          ) | Case No: 1:23-cv-00700 |
|            ) | |
| DUNLAP & COMPANY       ) | |
| INCORPORATED, CLYCE SMITH,    ) | |
| and ALLEN ANDERSON,        ) | |
|            ) | |
|     Defendants.       ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Brett Conover, ("Conover" or "Plaintiff") by and through his counsel of record, Tae Sture, hereby files his Complaint against Defendant, Dunlap & Company Incorporated ("Dunlap") for violation of his rights under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendment Act ("ADAAA"). Conover also sues Dunlap for violation of his rights under the Age Discrimination in Employment Act.

Conover sues Allen Anderson ("Anderson") for his *Frampton* violation (retaliation for lodging workers compensation claim). Conover sues Dunlap under the doctrine of *respondeat superior* for Conover's *Frampton* claim against Anderson because at all relevant times Anderson was acting within the scope of his employment with Dunlap.

Conover sues Clyce Smith ("Smith") under Indiana common law for negligent infliction of emotional distress. Conover sues Dunlap under the doctrine of *respondeat superior* for Conover's negligent infliction of emotional distress claim against Smith

1

because at all relevant times Smith was acting within the scope of his employment with

Dunlap.

## PARTIES

1. At all relevant times, Conover was a resident of Shelby County, Indiana.

2. Conover, was an employee of Dunlap and Company Incorporated, located in

   Bartholomew County, Columbus, Indiana.

3. Defendants Anderson and Smith, at all times relevant to Conover's claims, were

   employed by Dunlap.

## JURISDICTION

4. The Court has jurisdiction to try the case and has personal jurisdiction over the parties.

5. Conover resides in Shelby County, Indiana.

6. During the relevant time period Defendant, Dunlap, operated its business from

   Columbus, Indiana.

7. All actions which form the basis of these claims originated in the Southern District of

   Indiana.

8. Conover has exhausted his administrative remedies by timely filing an EEOC Charge on

   February 22, 2022.  Conover received the EEOC's Right to Sue letter, dated January 30,

   2023, on January 31, 2023.

9. Conover timely files his ADA claim within ninety days of receiving the EEOC's Notice

   of Right to Sue.

## FACTS COMMON TO ALL CAUSES OF ACTION

10. Conover was hired by Dunlap in September 2009 as a painter.

11. In or around the fall of 2017, Conover was diagnosed with a non-transitory medical impairment, spinal degeneration, which was diagnosed and treated by a physician.

12. In or around November 2017, Conover's physician placed him on permanent work restrictions which consisted of a weight-lifting restriction of no more than 50 lbs, no working from heights above five feet, and no wearing of safety harnesses.

13. Conover was restricted from lifting commercial sized paint containers which weigh more than 50 lbs and was also restricted from working/painting on lifts more than five feet above ground level because doing so would require him to wear a safety harness around his waist and back.

14. Conover delivered his work restrictions to Mr. Patrick McKinney ("McKinney"), Vice President of Dunlap, who agreed to honor and comply with his work restrictions. McKinney, in turn, passed Conover's work restrictions on to Jason Hyer ("Hyer"), Dunlap's Safety Director.

15. Conover applied for and in October 2017 obtained Indiana state handicap license plates for his vehicle.

16.  However, Hyer harassed Conover about his work restrictions, telling Conover that a doctor will give anyone who asks work restrictions and give out handicap license plates to everyone whether they need one or not.

17. Rather than accept Conover's physician's written work restrictions, Hyer repeatedly called Conover's physician, Dr. Hull, demanding Conover's medical records.

18. Dr. Hull refused.

19. Hyer was not a medical doctor in 2017.

20. To the best of Conover's knowledge and belief, Hyer was not, in 2017, qualified to challenge Dr. Hull's diagnosis of Conover or his medical treatment or the work restrictions he issued to Conover.

21. Over the course of several years, from the time Conover was placed on work restrictions in November 2017 to the date he was "laid off" on September 22, 2021, Dunlap management officials, including Anderson, Smith, and Dan Newman ("Newman"),Dunlap's Vice President, repeatedly told Conover, almost on a weekly basis, that he should retire or go on disability.

22. All this time, Conover was performing his job successfully.

23. At times, management officials ordered Conover to work against his work restrictions such as working at heights well over five feet, such as a 30-foot scissor lift or 60 foot articulate boom (cherry picker) in order to complete a paint job, all under threat of losing his job if he didn't.

24. Dunlap knew, or should have known, that Conover was restricted from working on these apparatuses because doing so required him to wear a safety harness around his waist and back which he was restricted from doing.

25. In or around December 2020, Conover observed one of Danny Tekulve's ("Tekulve"), employees operating machinery while drunk.  Tekulve was one of Dunlap's Job Superintendents.

26. Conover reported the safety hazard to his supervisor, Anderson.

27. After reporting that one of Tekulve's employees was working while drunk, Tekulve called Conover and threatened to "kick [your] f****ing ass," and "I'm gonna kill you!"

4

28. Conover reported Tekulve's threats to kill him to Anderson; however, Anderson did
    nothing.  Dunlap executive officials met with Conover to discuss Tekulve's threats and
    took no disciplinary action against Tekulve.

29. On March 23, 2021, Conover was diagnosed with serious lung problems and was placed
    on breathing-related restrictions, wherein he "should not be exposed to excessive airborne
    contaminates; should not wear a respirator or thick mask and should be limited to
    working with "low VOC," (Volatile Organic Compounds) or "zero VOC" paint products.

30. Conover delivered a copy of his work restrictions to Dunlap.

31. However, even after receiving these work restrictions, Dunlap assigned Conover to work
    with drywall which emits drywall dust and paints which contained chemicals dangerous
    to Conover.

32. Conover asked for Personal Protection Equipment ("PPE") which would protect him
    from improper exposure to the paint chemicals and was routinely denied.

33. On or about June 22, 2021, Smith assigned Conover to work from a 60-foot boom,
    requiring Conover to wear a safety harness which was against his work restrictions.
    Smith was aware of Conover's work restrictions against wearing a safety harness.

34. On or about June 23, 2021, Smith assigned a paint job to Conover.

35. Conover realized that the paint contained toxic chemicals and asked for a copy of the
    Material Safety Data Sheets ("MSDS") related to the paint.

36. Smith told Conover that there weren't any MSDS's, he didn't have a respirator, and that
    if he wouldn't paint, he was to go home and he (Smith) would get someone else to paint.

37. Conover proceeded to perform the paint job.

38. The next day, June 24, 2021, Conover continued to paint using the dangerous paint because Smith had directed him to do so or be sent home without pay.

39. The next day, June 25, Conover got very sick and ended up having to go to the Emergency Room.

40. That same day, Conover contacted the paint company asking for the paint MSDS.  The company representative called Conover and expressed alarm when she learned that he had been using the paint without a respirator and had a pre-existing lung condition.  She advised Conover to immediately notify his lung doctor and go seek medical attention as soon as possible.

41. Conover informed the new safety manager, Scott McGaha ("McHaha"), that he had gotten very sick.

42. Conover requested the company to pay his ER hospital bill of approximately $5,000.00.

43. On August 9, 2021, Conover went to the hospital and picked up a copy of the ER hospital bill.

44. Conover delivered a copy of the ER hospital bill to Scott McGaha who complained that the bill was too high.

45. A couple of weeks later, on August 26, 2021, Conover learned that Dunlap had paid Conover's hospital bill.

46. On September 22, 2021, Anderson informed Conover that he was laid off because there was no work for him.

## COUNT I.

### (ADA Disability Discrimination & Harassment)

47. Conover incorporates by reference paragraphs 1 through 46 above as if stated fully herein.

48. Dunlap knew Conover had two disabilities – 1) a bad back; and 2) impaired breathing.

49. Conover sought a reasonable accommodation in the form of work restrictions that would allow him to perform the essential functions of his job – painting.

50. Conover provided a copy of his doctor's prescribed work restrictions to Patrick McKinney who in turn relayed them to Dunlap's Safety Manager, Jason Hyer.

51. Hyer, without authorization from Conover, called Conover's doctor, Dr. Hull, several times in an attempt to obtain Conover's medical records.

52. Dr. Hull refused Hyer's requests.

53. Dunlap knew Conover had work restrictions related to his disabilities and agreed to abide by the work restrictions.

54. Conover performed his job satisfactorily even with his work restrictions.

55. Dunlap promised him they would abide by his work restrictions, but frequently violated them by making him work with dry wall which emits airborne particulates into the air and which Conover was forced to inhale.

56. Conover had work restrictions related to his bad back, such work restrictions consisting of, among other things, not wearing a restrictive safety harness which would put pressure on his spine.

57. Dunlap forced Conover to work on apparatuses which were raised to heights more than five feet above the ground.

58. Dunlap's safety policy and the Indiana Occupational Safety and Health Administration ("IOSHA") rules require employees to wear safety harnesses when working more than five feet above the ground in lift apparatuses.

59. Dunlap was aware of IOSHA safety rules.

60. Dunlap ignored Conover's work restrictions by forcing him to work in lift apparatuses and wear a safety harness in violation of his work restrictions, causing Conover to suffer pain while working.

61. As stated above, Conover also had a breathing disability and was placed on work restrictions by his doctor.

62. Dunlap forced Conover to perform work that violated his breathing-related work restrictions, such as dry wall work and painting without PPE.

63. Dunlap forced Conover to work in a hostile work environment when its management officials harassed Conover based on his disability by constantly telling Conover he should "go out on disability," forcing him to perform work outside of his disability-related work restrictions, accusing him of obtaining a handicap license plate even though he was not handicapped, and attempting to obtain his medical records from his physician in unfounded effort to show that Conover was not disabled and was malingering.

64. Dunlap discriminated against Conover in violation of the Americans with Disabilities as amended by the Americans with Disabilities Act Amendment Act.

## COUNT II.

### (ADA retaliation)

65. Conover incorporates by reference paragraphs 1 through 64 above as if stated fully herein.

66. Conover engaged in the protected activity of requesting, and availing himself of, a reasonable accommodation consisting of approved work restrictions, under the ADA in order to perform the essential functions of his job.

67. Dunlap retaliated against Conover after having engaged in protected activity under the ADA.

68. Dunlap created a retaliatory hostile work environment by routinely forcing him to work in violation of his work restrictions which had been granted by Dunlap; by making pejorative comments regarding his use of handicap license plates, and by constantly making sarcastic remarks about his disabilities such as he "should be thankful Dunlap allows you to work despite your disabilities."

69. Dunlap violated Conover's rights to be free from any retaliation under the ADA as amended.

70. Conover suffered damages resulting from Dunlap's retaliatory harassment.


## COUNT III.

### (ADEA Discrimination, harassment)

71. Conover incorporates by reference paragraphs 1 through 46 above as if stated fully herein.

72. Conover's date of birth is 1962. Conover is within the ADEA's protected age group of 40 years.

73. In or around August 2017, Mr. Patrick McKinney, VP and part Owner of Dunlap, promoted Conover to the position of Superintendent of Painting.

74. About a month later, in or around September 2017, McKinney rehired Allen Anderson who is much younger than Conover and who had retired the year before.

75. McKinney immediately demoted Conover from his position as Superintendent of Painting and promoted Anderson to Conover's old position of Superintendent even though Conover was performing his duties as Superintendent of Painting satisfactorily.

76. McKinney allowed Conover to retain his pay and his company cell phone.

77. However, as Superintendent of Painting, Anderson was not required to perform physical paint duties, whereas McKinney had required Conover to perform physical paint duties.

78. From approximately the fall of 2017 through his termination, various management officials harassed Conover by asking Conover on a weekly basis when he was going to retire.

79. These same officials did not ask Anderson when he was going to retire or suggest that Anderson retire.

80. Dunlap violated Conover's rights under the ADEA in forcing Conover to work in a hostile work environment by demoting him in favor of a younger employee and constantly harassing him about retiring.

81. Conover suffered damages resulting from Dunlap's violation of the ADEA.


## COUNT IV.

### (Frampton claim)

82. Conover incorporates by reference paragraphs 1-46 above as if stated fully herein.

83. On or about June 28, 2021, Conover initiated a Workers Compensation claim by notifying McGaha, Dunlap's Safety Director, that he had suffered a work-related injury.

84. On or about August 9, 2021, Conover demanded that Dunlap pay for his visit to the emergency room on June 25, 2021.

85. Reporting a work-related injury is tantamount to initiating a workers compensation claim with the employer under the *Frampton* doctrine.

86. Smith told Conover that the painting project at Lannett was at a stand-still and there was no more work for Conover.

87. Smith suggested Conover call Allen Anderson, the Superintendent of Painting, for a different paint assignment.

88. Anderson also told Conover that there was no more paint work for him.

89. Conover was one of the most senior painters at Dunlap and should have been assigned work over the less senior painters.

90. Dunlap laid Conover off even though he was one of the most senior painters at Dunlap.

91. Anderson and Dunlap could have assigned Conover to paint at  Lannett using low-VOC paint but refused to.

92. Dunlap posted a job announcement for Conover's painter position shortly after Anderson laid him off.

93. Conover was the only painter laid off while other less senior painters continued to be employed.

94. Anderson retaliated against Conover by laying him off on September 21, 2021, for having filed a worker-related injury claim in violation of the *Frampton* doctrine.

95. Conover sues Dunlap under the doctrine of *respondeat superior* because at all times relevant to this cause of action, Anderson was employed by Dunlap and was acting within the scope of his employment.

96. Conover suffered damages resulting from Smith and Anderson laying him off.

## COUNT V.

### (Negligent Infliction of Emotional Distress, Smith)

97. Conover incorporates by reference paragraphs 1 – 64 above as if stated fully herein.

98. On or about June 23, 2021, Smith assigned Conover to work a painting project using paint that Conover suspected contained VOC (volatile organic compounds).

99. Conover asked Smith for the MSDS for the suspected paint.

100.       Smith told Conover that there weren't any.

101.       Conover asked Smith for a respirator to protect him from dangerous paint fumes.

102.       Smith told Conover that he didn't have any respirators.

103.       Smith told Conover that if he didn't want to paint without a respirator to go home and he would have someone else do the painting.

104.       Under threat of termination, Conover started the paint project without a respirator.

105.       On June 24, 2021, Conover began to get sick while painting; he had difficulty breathing.

106.       Conover had to resort to his rescue inhaler several times, more than usual because of the toxic paint fumes.

107.       He reported his symptoms to Smith, all to no avail.

108.       During the course of the day, June 24, 2021, Conover became even sicker, having difficulty breathing and suffered episodes of hallucination.

109.       Conover had to leave work early on June 24, 2021, because he was having too much difficulty breathing and feeling as if he was going to die.

110.     Conover complained to Smith, again to no avail.

111.     On Friday, June 25, 2021, Conover called off work because he was so sick and

felt as if he couldn't breathe.

112.     Conover checked himself into the local hospital Emergency Room.

113.     Smith knew or should have known that the VOC chemicals in the paint he told

Conover to use were too toxic for Conover to use given Conover's breathing-related

work restrictions.

114.     Smith had a duty to protect Conover from exposure to the toxic fumes of the paint

by providing him with a respirator.

115.     Smith negligently breached his duty to Conover by failing to provide him with a

protective respirator and forcing him to paint without protection.

116.     Conover was forced to go to the hospital as a result of Smith's negligence.

117.     Conover suffered severe emotional distress as a result of Smith's negligence.

118.     Conover sues Dunlap under the doctrine of *respondeat superior* because at all

times relevant to this cause of action, Smith was employed by Dunlap and was acting

within the scope of his employment.


**WHEREFORE,** Conover requests the Court grant judgment for Plaintiff and against

Defendants for:

a.  back pay plus interest to be determined at trial;

b.  front pay from the date of judgment to January 6, 2032;

c.  compensatory and punitive damages under the ADA;

d.  pecuniary and liquidated damages under ADEA;

e.  emotional and punitive damages against Defendant Anderson for Conover's *Frampton* claim;

f.  emotional distress and punitive damages against Defendant Smith for Conover's Negligent Infliction of Emotional Distress claim;

g.  reasonable attorney fees and costs permitted under the ADA and ADEA;

h.  pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law; and,

i.  grant all other relief as the Court deems just and proper, including injunctive relief which includes a court-ordered prohibition against any form of retaliation against Conover by any of the Defendants.

## **DEMAND FOR JURY TRIAL**

Conover requests trial by jury on all issues so triable.

Respectfully Submitted,

*/s/  Tae Sture*
Tae Sture, Attorney No. 25120-29
Counsel for Plaintiff
Sture Legal Services LLC
155 E Market Street, Ste 700
Indianapolis, IN 46204
Ph:      (317) 577-9090
Fax:     (317) 577-1102
Email:  tae@sturelaw.com